# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00508-CV

**Boris Goldstein, Appellant**

**v.**

**Janet Mortenson, Permanent Receiver for Austin Forex, L.L.C. and Austin Forex
International, Inc.; Randy Butler; Melissa A. Butler; Mel Daniels; Darrell
Dillon; Jeff Comp; Kay Comp; Mary Ann Eisinger; John Sheffield;
Mark Miller; and Pierce Sullivan, acting on behalf of themselves
and all others similarly situated, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
## NO. 99-12003-F, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## O P I N I O N

Appellees Janet Mortenson, Permanent Receiver for Austin Forex, L.L.C., and Austin

Forex International, Inc., along with a class of investors (collectively "Mortenson"), brought suit

against appellant Boris Goldstein for damages they suffered as a result of a securities-fraud scheme.

The district court awarded Mortenson actual and exemplary damages for fraud, usury, and violations

of the Texas Securities Act. Tex. Rev. Civ. Stat. Ann. arts. 581-1–581-43 (West 1964 & Supp

2003). Goldstein, challenging the sufficiency of the evidence, appeals by seven issues. We reform

and, as reformed, affirm.

**BACKGROUND**

This dispute arises from Goldstein's business dealings with Russell Erxleben and Erxleben's investment companies, Austin Forex, L.L.C. and Austin Forex International, Inc. (collectively "AFI"). Erxleben established AFI in September 1996 for the purpose of trading in the foreign-currency market. What he actually engaged in was a type of "Ponzi scheme."[1] Individuals investing funds with Erxleben signed contracts authorizing AFI to make all decisions concerning trading in their accounts with AFI.[2] Erxleben himself made all of the decisions concerning the trading of client funds. He only traded investor accounts as a block or "pool," rather than individually. The pool sustained serious actual and floating losses,[3] but the statements AFI sent to individual investors never disclosed this fact and reflected only gains. Relying on this information

---

[1] A "Ponzi scheme" is an investment fraud wherein investors are enticed with the promise of extremely high returns or dividends over a very short period of time. *Gutierrez v. Cayman Is. Firm of Deloitte & Touche*, 100 S.W.3d 261, 266 n.1 (Tex. App.—San Antonio 2002, no pet.). Investors are paid "from monies obtained from later investors rather than from profits of the underlying business venture." *Caldwell v. State*, 95 S.W.3d 563, 566 n.1 (Tex. App.—Houston [1st Dist.] 2002, no pet.). "The scheme takes its name from Charles Ponzi, who in the late 1920s was convicted and punished for fraudulent schemes he conducted in Boston." Bryan A. Garner, *Dictionary of Modern Legal Usage* 671 (2d ed. 1995).

[2] For example, the contract signed by investor Jeff Comp provided in pertinent part that

> [w]ithout any notice to Client, AFI may transfer any funds among different Accounts, including and without limitation, trading profits/losses, Commission, and Transaction Fees due by Client to AFI, and funds in Client's Account to be utilized as Margins. AFI may trade the funds in Client's Account either with or without an Order from Client.

[3] As defined by the parties, a "floating loss" or "unrealized loss" is a loss sustained during a trade in the foreign-currency-trading market. The loss "floats" because the trade has not been closed out, and it is subject to ongoing changes in the market. Once the trade is closed out, the loss becomes a "realized loss."

2

and believing that AFI was a successful venture, clients continued to invest with AFI and encouraged others to do so.

Initially, Erxleben's trades were placed by phone through Frankwell Investment Services, a Houston company. The time expended in placing phone calls allowed market positions in foreign currency to change, often resulting in serious losses for AFI and, thus, the investors' accounts. The negative effect resulting from such delay is known in the industry as "slippage." In an effort to solve the slippage problem, AFI began looking for a brokerage firm with real-time technology. Goldstein was the majority shareholder and an officer and director of E-Forex, Inc., a California-based company that offered such a service. In March 1997, AFI contracted with E-Forex for brokerage services and for a software package enabling real-time trading. Within a short time, AFI was using E-Forex to conduct its foreign-currency trades. Most of the communication between AFI and E-Forex occurred between AFI's chief operating officer, Michael Shapiro, and E-Forex's president, Craig Harper. Shapiro and Harper met several times to discuss remedying the slippage issue. However, even with E-Forex's services, slippage continued to cause losses for AFI and its investors.

In December 1997 or January 1998, the Texas State Securities Board began investigating to determine if AFI was selling unregistered securities. Early in 1998, Erxleben and Shapiro realized that the difference between the amount of money reflected on investor statements and the amount of money actually in AFI's account at E-Forex had grown to a deficit of $8.6 million. AFI determined to seek a loan to cover the deficit. Shapiro contacted Harper, who referred him to Goldstein. There is no evidence that AFI sought to borrow money from any other source before

3

Shapiro contacted Goldstein. In March, Shapiro met with Goldstein in New York, seeking assistance in securing a loan to fill the gap. At the meeting, Goldstein indicated that he had a contact that could help with the loan. Within a few days of the meeting, AFI—without making a loan application, submitting financial statements, or providing security—received a facsimile from Sovereign Allied Bank, Inc.,[4] containing documents to consummate an $8,611,392 loan. On March 16, 1998, AFI officers, including Erxleben, signed the loan documents. Sovereign Allied Bank required neither security from AFI nor personal guarantees from its officers.

On June 16, 1998, the Securities Board sent a subpoena to Harper, requesting that he turn over records concerning AFI. Harper notified Shapiro, Goldstein, and his attorney, that he had received the subpoena. E-Forex did not immediately respond to the subpoena. In correspondence dated August 31, 1998, Goldstein asked Shapiro how to handle "the request from Texas." E-Forex turned over AFI's records after a two-month delay. AFI ceased operations on September 14.

On September 18, 1998, the Securities Board filed suit against various entities and persons, including Erxleben and AFI. That same day, the district court appointed Mortenson temporary receiver of AFI.[5] On October 13, 1999, Mortenson brought this action against a number of defendants involved with AFI, including attorneys, law firms, Goldstein, E-Forex, and several E-Forex officers and directors. After a series of severances and settlements with the other defendants, the case moved forward against Goldstein and E-Forex. Goldstein and E-Forex declared bankruptcy

[4] The parties refer to the Sovereign Allied Bank of Nauru. The bank was apparently organized under the laws of the Pacific Republic of Nauru. The letterhead appearing at the top of the loan documents sent to AFI reads "Sovereign Allied Bank, Inc." We will refer to the Sovereign Allied Bank.

[5] Later, in June 1999, the district court appointed Mortenson permanent receiver.

in California, and the state-court proceedings in Texas were stayed. *See* 11 U.S.C.A. § 362(a)(1)

(West 1993 & Supp. 2003) (filing petition in bankruptcy stays pending legal actions against debtor).

The California bankruptcy court dismissed Goldstein's bankruptcy petition. *In re Goldstein*, No. 01-

3-0410-TC (Bankr. N.D. Cal. 2001). The Texas district court then granted a motion by Mortenson

to sever her claims and proceed with her suit against Goldstein. After a bench trial, the district court

rendered judgment that Mortenson recover from Goldstein actual damages in the sum of

$36,600,826.57.

> for his sale of unregistered securities by means of untrue statements of material fact
> or omissions in violation of the Texas Securities Act, for aiding and abetting in the
> sale of unregistered securities, through the use of fraudulent omissions and
> representations, in violation of the Texas Securities Act; for fraud committed upon
> AFI; and for conspiracy to defraud the plaintiff investors.

The court also awarded $11,827,143 in prejudgment interest "on the fraud claims through July 1,

2001," $15,634,134 for usury violations, and $200 million in exemplary damages based on

"[Goldstein's] willful and malicious conduct towards AFI and plaintiff investors, by which conduct

[he] specifically intended to cause substantial injury to AFI and plaintiff investors." The total

judgment against Goldstein was $264,062,103.57. The court filed findings of fact and conclusions

of law in support of the judgment.

Goldstein appeals by seven issues. In issues one through five he argues that the

district court erred because there was no evidence or the evidence was insufficient to show that: (a)

he violated sections 33A of the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581-33A (West

Supp. 2003); (b) he violated sections 33F(1) and (2) of the Texas Securities Act, *id*. art. 581-33 F(1),

5

(2) (West Supp. 2003); (c) he should be jointly and severally liable for all AFI trading losses; (d) E-Forex, Inc. was the alter ego of Goldstein and as such its liability for usury, fraud, conspiracy, and violations of the Texas Securities Act should be imputed to him; or (e) he directly committed any fraud on AFI or AFI investors. In issues six and seven, Goldstein challenges the district court's award of exemplary damages by arguing that there is no clear-and-convincing evidence that Goldstein acted with malice or reckless indifference or that damages resulted from the specific circumstances of the usury statute for which Goldstein was directly or vicariously liable or as a consequence of his culpable mental state, or in the alternative, that the exemplary damages are excessive.

## STANDARD OF REVIEW

Goldstein's issues do not state specifically whether he is challenging the factual or legal sufficiency of the evidence. His argument summary reflects that he is challenging the legal sufficiency, but the cases cited in the body of the argument contain the standard for a factual-sufficiency review. We will, in the interest of justice, review the evidence under both standards. *See* Tex. R. App. P. 38.9; *Gregory v. Sunbelt Sav., F.S.B.*, 835 S.W.2d 155, 157 n. 2 (Tex. App.—Dallas, 1992, writ denied). A trial court's findings of fact are reviewable for factual and legal sufficiency of the evidence by the same standards as are applied in reviewing the factual and legal sufficiency of the evidence supporting a jury's finding. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Starcrest Trust v. Berry*, 926 S.W.2d 343, 352 (Tex. App.—Austin 1996, no writ).

In reviewing a legal-sufficiency challenge, we consider the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Merrell*

*Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *Associated Indem. Corp. v. CAT Contracting*, 964 S.W.2d 276, 285-86 (Tex. 1998). We will uphold the finding if more than a scintilla of evidence supports it. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995); *Catalina*, 881 S.W.2d at 297. The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *Burroughs Wellcome*, 907 S.W.2d at 499.

In conducting a factual-sufficiency review, we consider and weigh all of the evidence and set aside the judgment only if it is factually so weak or so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986 ); *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951); *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L. Rev. 515, 534 (1991).

## DISCUSSION[6]

### *Securities-Act Violations*

The district court concluded that Goldstein "materially aided and abetted AFI, Erxleben and others" in the fraudulent sale of securities. By his first and second issues, Goldstein

---

[6] Goldstein argues that his invocation of his Fifth Amendment privilege against self-incrimination, during his deposition, should not result in any adverse inferences. *See* U.S. Const. amend. V; *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (Fifth Amendment "does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"). Specifically, he argues that his invocation is not "in and of itself" enough to support a finding of malice. Although our holding is not predicated upon a finding of malice, our review of the legal and factual sufficiency of the evidence excludes any such inferences.

contends that there was no evidence or insufficient evidence to show that he violated article 581-33A, F(1), and (F)(2) of the Texas Securities Act. Tex. Rev. Civ. Stat. Ann. arts. 581-33A, F(1), (2). By his third issue, he asserts that there was no evidence or insufficient evidence that he should be "liable, jointly and severally, for all of AFI['s] trading losses." Section 33A sets forth the liability of sellers and, as is relevant here, allows a buyer of a security to sue the seller of the security for rescission or damages. *Id.* art. 581-33A. Section 33F extends liability to those who control or aid a seller and provides, in pertinent part, that:

> A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller . . . of a security is liable under Section 33A . . . jointly and severally with the seller . . . and to the same extent as if he were the seller.

*Id.* art. 581-33F(2). In order to establish such liability, a plaintiff must demonstrate:

> (1) that a primary violation of the securities laws occurred; (2) that the alleged aider had "general awareness" of its role in this violation; (3) that the actor rendered "substantial assistance" in this violation; and (4) that the alleged aider either a) intended to deceive plaintiff or b) acted with reckless disregard for the truth of the representations made by the primary violator.

*Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (citing Keith A. Rowley, *The Sky is Still Blue in Texas: State Law Alternatives to Federal Securities Remedies*, 50 Baylor L. Rev. 99, 182 (1998)).

Goldstein concedes in his brief that a primary violation of the law occurred: "It is undisputed between the parties that Erxleben engaged in the sale of securities in violation of the

8

Texas Securities Act."[7] Mortenson contends that Goldstein aided Erxleben and AFI in delaying and hindering the investigation by the Securities Board by arranging the $8.6 million loan for AFI, which if consummated would have cloaked the trading losses incurred by AFI.[8] Shapiro testified that he met with Goldstein in New York in March 1998. He told Goldstein that AFI needed a loan to cover an $8.6 million difference between what AFI actually had and what it was representing to its investors that it had.

> Q: Well you told Mr. Goldstein in New York that the 8.6 million was the difference between what you were telling people you had and what you really had, correct?
>
> A: That's correct.
>
> Q: And in response to that he told you that he had a contact that might help you be able to get a loan, right?
>
> A: Yes.

Goldstein was more than generally aware of the reason for the loan; he was explicitly told by Shapiro why AFI needed the loan. The loan was funded by Sovereign Allied Bank, a bank with which Goldstein was affiliated.[9] By arranging the loan for AFI, Goldstein provided substantial assistance

---

[7] For purposes of this opinion, we accept Goldstein's concession and assume without deciding that the trading contracts were securities and that Erxleben and AFI engaged in the sale of securities in violation of the Act.

[8] Shapiro testified that the loan documents stated that the $8.6 million would be made available to AFI at an E-Forex Europe account. Shapiro testified that, to his knowledge, E-Forex Europe was owned by E-Forex America. Mortenson testified that she found no evidence that the $8.6 million was ever deposited into AFI's accounts from the E-Forex Europe account at Sovereign Allied Bank.

[9] Mortenson argues that Sovereign Allied Bank was another alter-ego corporation of Goldstein's. AFI investor, Lewis Talbert, testified that Goldstein led him to believe that Sovereign

9

enabling AFI it to continue to operate, as well as to delay the Securities Board's discovery of wrongdoing. Goldstein was given enough information by Shapiro to alert him to the possibility of AFI's illegal activity. At the very least, his failure to conduct a minimal investigation and inquiry before assisting AFI with the loan shows "a reckless disregard for the truth or the law." Tex. Rev. Civ. Stat. Ann. art. 581-33F(2).

Goldstein denies that he was "involved in the deposit . . . of $8.6 million in an account at E-Forex Europe on behalf of" AFI. This however is not the same as being involved in *procuring* the loan. Goldstein's brief states that he "facilitated a contact" for obtaining the loan. Goldstein's testimony does not materially conflict with Shapiro's. We hold that the evidence is both legally and factually sufficient to support the district court's judgment that Goldstein is liable for materially aiding a seller of illegal securities. We overrule Goldstein's second issue.[10]

By his third issue, Goldstein argues that there is no evidence or insufficient evidence that he should be jointly and severally liable for all AFI trading losses.[11] We have upheld the district

Allied Bank was "his" bank by offering "his share" of the bank in exchange for a share in a foreign-currency-exchange venture of Talbert's. Goldstein testified that he did not own an interest in the bank and that he did not tell Talbert that he did. He testified that he had been responsible for Sovereign Allied Bank's account at Commercial Bank of San Francisco, where he served as a director and board member. However, Goldstein concedes in his brief that the evidence supports a finding that he had an ownership interest in Sovereign Allied Bank. Whether Sovereign Allied Bank was Goldstein's alter ego has no bearing on our resolution of this appeal.

[10] Because section 33F extends to those who aid sellers the same section 33A liability as sellers, we need not and do not determine whether Goldstein himself was a seller, and overrule Goldstein's first issue. Tex. Rev. Civ. Stat. Ann. art. 581-33F(2) (West Supp. 2003) (person who aids securities-act violator is liable to same extent as violator).

[11] It is unclear with whom Goldstein alleges he has been held jointly and severally liable. The district-court judgment addresses only Goldstein. The court's findings of fact state not only that "Goldstein, on his own and acting in conspiracy with Erxleben and AFI," engaged in fraudulent

10

court with respect to Goldstein's aider liability under section 33F(2) of the Act. Section 33F(2) expressly mandates that a person who aids in the sale of unregistered securities is "jointly and severally liable with the seller . . . and to the same extent as if he were the seller." Tex. Rev. Civ. Stat. Ann. art. 581-33F(2); *see Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998); *Frank*, 11 S.W.3d at 384. This Court need not consider joint and several liability, because one who materially aids a seller of illegal securities is liable to the same extent as the seller. Goldstein is thus liable to the same extent as AFI. His third issue is without merit and is overruled.

*Fraud*

By his fifth issue, Goldstein argues that there is no evidence or insufficient evidence to show that he directly committed fraud on AFI or its investors. The district court's judgment orders Mortenson to recover actual damages from Goldstein for, *inter alia*, "fraud committed upon AFI; and for conspiracy to defraud the plaintiff investors."

Mortenson's fifth amended petition alleged that Goldstein committed securities fraud by misrepresenting material facts about the investment potential of AFI. The securities act defines "fraud" and "fraudulent practice" as including:

> any misrepresentations, in any manner, of a relevant fact; any promise or representation or prediction as to the future not made honestly and in good faith, or

---

conduct, but also that "Goldstein conspired with E-Forex, Erxleben and AFI to defraud the plaintiff investors." In his conclusions of law, the district court concluded that "Goldstein conspired with AFI, Erxleben and others to defraud plaintiff-investors." In his brief, Goldstein argues "that there is no legally competent evidence to support Goldstein's participation in the conspiracy with Harper, Shapiro, AFI, Erxleben or any other person or entity through which Goldstein may be held jointly and severally liable for all of the AFI trading losses."

11

an intentional failure to disclose a material fact; the gaining directly or indirectly, through the sale of any security, of an underwriting or promotion fee or profit, selling or managing commission or profit, so gross or exorbitant as to be unconscionable; any scheme, device or other artifice to obtain such profit, fee or commission; provided, that nothing herein shall limit or diminish the full meaning of the terms "fraud," "fraudulent," and "fraudulent practice" as applied or accepted in courts of law or equity.

Tex. Rev. Civ. Stat. Ann. art. 581-4F (West 1964). Upon reviewing the district court's findings of fact and the record as a whole, we have not discovered any misrepresentations or intentional failure to disclose a material fact made directly by Goldstein to AFI. In fact, Erxleben testified that he relied upon the representations of Harper and others at E-Forex regarding the system for placing trades with E-Forex and the various banks. The fraudulent representations that Mortenson and the district court point to are attributable to Harper and the corporate entity of E-Forex. After reviewing only the evidence and reasonable inferences that tend to support the finding, we hold that the evidence amounts to no more than a scintilla and is, therefore, legally insufficient to show that Goldstein directly defrauded AFI.

We now turn to whether Goldstein directly defrauded AFI's investors by means of a conspiracy. A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). The elements of a conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Id.* A conspiracy requires a meeting of the minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; there must be a preconceived plan and unity of

12

design and purpose. *Ward v. Sinclair*, 804 S.W.2d 929, 931 (Tex. App.—Dallas 1990, writ denied) (citing *Zervas v. Faulkner*, 861 F.2d 823, 836 (5th Cir. 1988) (citing *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968))).

> A conspiracy to defraud on the part of two or more persons means a common purpose, supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each has the understanding that the other has that purpose.

*Schlumberger*, 435 S.W.2d at 856 (quoting *Great Nat'l Life Ins. Co. v. Chapa*, 377 S.W.2d 632, 635 (Tex. 1964)). Thus, for a defendant to be liable for civil conspiracy to defraud, it must be shown not only that there was such a conspiracy, but that the particular defendant agreed with one or more of the other conspirators on the claimed illegal object of the conspiracy and intended to have it brought about. *Zervas*, 861 F.2d at 836. An alleged conspirator is not liable for an act not done in pursuance of the common purpose of the conspiracy. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 928 (Tex. 1979). Moreover, proof that an individual had some collateral involvement in a transaction, and had good reason to believe that there existed a conspiracy among other parties to it, is insufficient of itself to establish that the defendant was a conspirator. *Id*. (citing *Schlumberger,* 435 S.W.2d at 857). However, "once a conspiracy is proven, each coconspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'" *Carroll,* 592 S.W.2d at 926 (quoting *State v. Standard Oil Co.*, 107 S.W.2d 550, 559 (Tex. 1937)).

In *Schlumberger*, the supreme court held that there was no evidence that Schlumberger had actual knowledge or intent to participate in wrongdoing. 435 S.W.2d at 857. The court determined that Schlumberger knew that four oil wells were slant drilled and that the

13

corporation took steps to hide this information to protect its customers. *Id*. at 856. The supreme court, however, determined that the evidence did not indicate that Schlumberger had knowledge of the lease boundary lines, thus "knowledge of the object of the conspiracy and intention to injure adjoining owners" was only "suspicion and speculation." *Id*. The court stated that "[o]ne without knowledge of the object and purpose of a conspiracy cannot be a co-conspirator; he cannot agree, either expressly or tacitly, to the commission of a wrong which he knows not of." *Id*. at 857.

By contrast, here the evidence is sufficient to show that Goldstein conspired to commit fraud. Erxleben testified that it was AFI's goal to keep its losses secret in order to attempt to turn things around while avoiding panic by the investors. Goldstein assisted in the cover-up. That he was aware of AFI's losses is demonstrated by Shapiro's testimony about their conversation in New York:

Q:  [to Shapiro] And you explained to Mr. Goldstein that there was this gap between what you were telling people you had and what you really had, right?

A:  I briefly explained to [Goldstein] at dinner in New York exactly what you just stated.

After returning to Austin from the New York meeting, Shapiro received a facsimile, which he described: "The first thing he [Alex Green of Sovereign Allied Bank] sent was, if I recall correctly, was a fax [which stated] 'Mr. Goldstein has asked me to contact you. You are looking for an 8.6 million dollar loan.'" Additionally, Goldstein knew as early as June 1998 that E-Forex had been served with the Securities Board subpoena requesting AFI's records. Over two months later, he wrote to Shapiro, asking, "[w]hat do you want us to do with the request from Texas?" This

14

correspondence demonstrates that the critical element of conspiracy—a meeting of the minds—was present in this case. Goldstein knew that AFI was not disclosing losses to its investors. He not only kept silent about the fact for purposes of the investigation, but he also actively participated in procuring a loan for the purpose of presenting a false image to the Securities Board and AFI investors. We hold that Goldstein participated in a conspiracy to defraud AFI's investors and thus is liable for the fraud as a coconspirator. *See Kirby v. Cruce*, 688 S.W.2d 161, 164 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) (if actual damages proven, showing of civil conspiracy imposes joint and several liability on all coconspirators for actual damages resulting from conspiratorial acts). We overrule Goldstein's fifth issue.

### *Alter Ego*

By issue four, Goldstein argues that there is no evidence or the evidence is insufficient to show that he is the alter ego of E-Forex, and therefore the liability of E-Forex for fraud, usury, conspiracy, and violations of the Texas Securities Act may not be imputed to him. The district court concluded that Goldstein was the alter ego of E-Forex and found, not only that E-Forex had violated the Texas Securities Act, but also that E-Forex had conspired with Erxleben and AFI to defraud investors and had charged AFI usurious interest at the rate of 118.2% as "storage charges."[12] We have held that the evidence is sufficient to show that Goldstein is directly liable for

---

[12] AFI often would leave positions "open" at the end of the trading day. Erxleben testified that some positions were left open for months. When this occurred AFI was charged storage fees. Sergei Koulinitch, an E-Forex employee, testified that the storage fee represented interest on the money AFI borrowed to make the trade on leverage. Goldstein does not appeal the district court's conclusions that the storage fees represented interest charges and were usurious.

15

violating the Texas Securities Act and conspiring to defraud AFI's investors. Therefore, we need only address whether the corporate veil will shield Goldstein from the damages for usury.

In order to hold Goldstein responsible for the actions of E-Forex, there must be a sufficient reason to disregard the corporate fiction, or pierce the corporate veil. We disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result. *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986) (citing *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 340 (Tex. 1968)). *Castleberry* lists six bases for disregarding the corporate fiction:

(1) when the fiction is used as a means of perpetrating a fraud;

(2) where a corporation is organized and operated as a mere tool or business conduit of another corporation;

(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation;

(4) where the corporate fiction is employed to achieve or perpetrate monopoly;

(5) where the corporate fiction is used to circumvent a statute; and

(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.

*Id*. at 272.

Mortenson argues that Goldstein falls within categories one, two, and five. However, Mortenson pleaded, and the district court found, that Goldstein is the alter ego of E-Forex, which brings him under category two. *See id.* at 272 (discussing that although alter ego is only one basis

16

for disregarding corporate fiction, distinction is often blurred and alter ego is treated as synonymous with entire doctrine).  The finding of alter ego is what Goldstein appeals.

Alter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice.  *Id*.  Stated another way, "where a corporate entity is owned or controlled by an individual who operates the company in a manner indistinguishable from his personal affairs and in a manner calculated to mislead those dealing with him to their detriment, the corporate fiction may be disregarded."  *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 229 (Tex. 1990).  An alter-ego relationship may be shown from the total dealings of the corporation and the individual.  *Castleberry,* 721 S.W.2d at 272.  This showing may include evidence of "the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes."  *Id.*

Mortenson presented evidence to show that Goldstein is an officer, director, and majority shareholder of E-Forex.  Standing alone, this is not a basis for finding that Goldstein is the alter ego of E-Forex.  In *Rosenthal v. Leaseway of Texas, Inc*., Rosenthal was held to be the corporation's alter ego because he was the sole owner, and the only corporate formality observed was the obtaining of a charter.  544 S.W.2d 180, 182 (Tex. Civ. App.—Tyler 1976, no writ).  In *Francis v. Beaudry*, the court held that the evidence supported the alter ego theory against the two sole stockholders and directors of the corporation.  733 S.W.2d 331, 333 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).  There were no regular shareholder and director meetings, no obtaining of director

17

approval before the corporation acted, failure to maintain corporate records, and distribution of corporate assets for personal use to the directors. *Id.* at 334-35.

Here, no evidence was presented touching on the extent to which corporate formalities were observed or not observed, whether there were regular shareholder and director meetings, whether there was a failure to maintain corporate records, or whether company profits were diverted to Goldstein for his personal use. Although no evidence was presented to show that corporate formalities were followed, it is Mortenson who bears the burden of proof on the issue of alter ego. *See Torregrossa v. Szelc*, 603 S.W.2d 803, 804 (Tex. 1980). It may be true that AFI's investors were harmed by E-Forex's charging usurious interest, but a court may not pierce the corporate veil on a mere showing that an individual served as a director and officer of a corporation and that he held an ownership interest in the corporation. We hold that the evidence in support of holding that Goldstein is the alter ego of E-Forex is "so weak as to do no more than create mere surmise or suspicion," and the legal effect is that there is no evidence. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). Absent proof of alter ego, the damages for usury cannot be imputed to Goldstein. We sustain Goldstein's fourth issue.

*Exemplary Damages*

Issues six and seven challenge the award of exemplary damages on alternative grounds. By issue six, Goldstein contends that the district court erred in awarding exemplary damages "because there is no clear and convincing evidence that Goldstein acted with malice or reckless indifference, or that the damages claimed by Plaintiffs resulted from the specific circumstances of the usury statute for which Goldstein was directly or vicariously liable or as a

18

consequence of Goldstein's culpable mental state." The civil practice and remedies code provides a clear guideline for awarding exemplary damages and for reviewing such awards. Section 41.010(b) provides that "the determination of whether to award exemplary damages . . . is within the discretion of the trier of fact." Tex. Civ. Prac. & Rem. Code Ann. § 41.010(b) (West 1997). The code allows for recovery of exemplary damages for "(1) *fraud*; (2) malice; or (3) wilful act or omission or gross neglect in wrongful death actions . . . ." *Id*. § 41.003(a) (West 1997) (emphasis added). Goldstein challenges the evidence supporting the district court's finding of malice and reckless indifference, as well as any culpability under the usury statute. However, he has neglected to acknowledge that the civil practice and remedies code allows for the recovery of exemplary damages upon a showing of fraud alone. *Id.*; *Myers v. Walker*, 61 S.W.3d 722, 731 (Tex. App.—Eastland 2001, pet. denied) (under statute exemplary damages may be awarded for harm resulting from "fraud *or* malice"). We have determined that Goldstein conspired to defraud AFI investors and have addressed the evidence supporting such determination. Therefore, we overrule Goldstein's sixth issue.

By his seventh issue, Goldstein challenges the exemplary-damages award as excessive. An award of exemplary damages rests largely in the discretion of the fact finder and will not be set aside as excessive unless the amount is so large as to indicate that it is the result of passion, prejudice, or corruption, or that the evidence has been disregarded. *Ethicon, Inc. v. Martinez*, 835 S.W.2d 826, 835 (Tex. App.—Austin 1992, writ denied) (citing *Crutcher-Rolfs-Cummings, Inc. v. Ballard*, 540 S.W.2d 380, 389 (Tex. Civ. App.—Corpus Christi 1976, writ ref'd n.r.e.)); *see* Tex. Civ. Prac. & Rem. Code Ann. § 41.010(b). In reviewing an award of exemplary damages, we consider:

19

> (1)   the nature of the wrong;
>
> (2)   the character of the conduct involved;
>
> (3)   the degree of culpability of the wrongdoer;
>
> (4)   the situation and sensibilities of the parties concerned;
>
> (5)   the extent to which such conduct offends a public sense of justice and propriety;
>
> (6)   the net worth of the defendant.

Tex. Civ. Prac. & Rem. Code Ann. § 41.011 (West 1997).[13] Because the code establishes a limit on exemplary damages, which the district court exceeded, we do not consider the reasonableness of the award. The code allows for exemplary damages only to the extent of "the greater of:  (1) two times the amount of economic damages; plus an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000." *Id*. § 41.008(b) (West Supp. 2002).  Here, the district court awarded exemplary damages in the ratio of 5.5 to 1. We conclude that the district court erred in awarding more than two times actual damages. Because we have sustained Goldstein's issue regarding the district court's usury award and because prejudgment interest may not be included in the exemplary-damages calculation, *see id*. § 41.007 (West 1997), exemplary damages must be calculated using only the $36,600,826.75 in actual damages awarded by the district court.  We sustain Goldstein's seventh issue.

---

[13] These factors also appear in *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981). *Kraus* predates the addition of section 41.011 to the civil-practice-and-remedies code. *See* Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 112. The sixth factor listed in the statute did not appear in the *Kraus* list.

## CONCLUSION

We hold that the evidence is both legally and factually sufficient to support the district court's judgment that Goldstein materially aided in the sale of securities in violation of the Texas Securities Act and that he conspired to commit securities fraud, and is thus liable for actual damages in the amount of $36,600,826.57. We hold that the evidence is not legally sufficient to support the judgment's award of damages against Goldstein for usury and that the exemplary-damages awarded against Goldstein exceed the statutory cap established by the legislature. We reform the judgment to reflect that Mortenson take nothing by her action against Goldstein for usury. We further reform the judgment to reflect an award of $73,201,653.50 (two times the actual damages) in exemplary damages, resulting in a total judgment against Goldstein of $121,629,623.07. As reformed we affirm the district court's judgment.

_____

Lee Yeakel, Justice

Before Justices B. A. Smith, Yeakel and Aboussie[*]

Reformed and, as Reformed, Affirmed.

Filed: July 30, 2003

---

[*]  Before Marilyn Aboussie, Chief Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).