United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 28, 2006**

Charles R. Fulbruge III
Clerk

REVISED JUNE 2, 2006

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 04-11514

BOLLORE SA; NORTH ATLANTIC TRADING COMPANY;
NORTH ATLANTIC OPERATING COMPANY

                    Plaintiffs - Appellees

    v.

IMPORT WAREHOUSE INC; ET AL

                    Defendants

    v.

NAJAT MACKIE; FREETOWN MINI MART INC

                    Movants - Appellants

Appeal from the United States District Court
for the Northern District of Texas, Dallas
No. 3:99-CV-1196-R

Before KING, BARKSDALE and PRADO, Circuit Judges.

KING, Circuit Judge:

    In this appeal, Appellants Najat Mackie and Freetown Mini

Mart, Inc., challenge the district court's order piercing

Freetown Mini Mart's corporate veil and adding them both as

judgment debtors in a turnover proceeding pursuant to TEX. CIV.

PRAC. & REM. CODE § 31.002.  For the following reasons, we VACATE

the district court's orders as they apply to Najat Mackie and Freetown Mini Mart, Inc.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises against the backdrop of an elaborate international scheme involving Ali Mackie,[1] one member of a Michigan family that engaged in the manufacture, distribution, and sale of counterfeit Zig-Zag cigarette papers primarily in the states of Michigan, Texas, and California.  In March 1999, Bolloré S.A., North Atlantic Trading Company, and North Atlantic Operating Company (collectively, "Appellees"), as the holders and exclusive licensees of the Zig-Zag trademarks, filed a lawsuit against various members of the Mackie family (the "Mackie Defendants") in the Northern District of Texas, alleging that the Mackie Defendants and their co-defendants had violated federal copyright and trademark laws.[2]  The district court issued a preliminary injunction in July 1999, which temporarily suspended the counterfeiting operation.

In 2001, as a result of raids pursuant to an ex parte seizure order issued by a California federal court, Appellees

_____

[1]  The record at times refers to the Mackie family as the "Makki" family; for the sake of consistency, we will use a uniform spelling throughout.

[2]  The Mackie Defendants did not include current Appellants Najat Mackie or Freetown Mini Mart, Inc., the gas station that she owned.  Ali Mackie, who is Najat Mackie's son, was added as a defendant in 2001.  Ali Mackie is not an appellant in the current proceeding because his appeal was dismissed for want of prosecution on May 23, 2005.

discovered new evidence of continuing counterfeiting activity and filed a contempt motion against the Mackie Defendants in the Northern District of Texas.  In July 2002, after a contempt hearing in the district court and the entry of a contempt order, Appellees received a final contempt judgment against the Mackie Defendants, including Ali Mackie, for $11 million ("the Final Judgment").[3]  The judgment was placed in escrow pursuant to a settlement agreement.

In February 2004, after Appellees became aware that the Mackie Defendants had not stopped their counterfeiting activities as required by the settlement agreement, Appellees brought another contempt action against the Mackie Defendants and began to execute on the Final Judgment.  Even though he had wired large amounts of money overseas in connection with the counterfeiting scheme, by 2004 Ali Mackie had no assets with which to satisfy the judgment against him.  While preparing to execute on the Final Judgment, in July 2004, Appellees took depositions of the Mackie Defendants and their families, including Ali Mackie and his mother, Najat Mackie.  Among other things, Appellees learned for the first time that Ali Mackie worked and performed managerial duties for his mother's gas station in Detroit, Freetown Mini Mart, Inc. ("Freetown"), in return for free room,

---

[3]  The Mackie Defendants, including Ali Mackie, were jointly and severally liable for the judgment amount.  Neither Najat Mackie nor Freetown Mini Mart, Inc., was named as a judgment debtor.

board, and a leased car from his mother.  The record reflects that, at all times relevant to these proceedings, Najat Mackie was Freetown's sole shareholder and resided in Michigan, and Freetown, a corner gas station and convenience store, conducted business only in Michigan.  Najat Mackie owned no land and entered into no contracts in the state of Texas.

In an effort to collect on the Final Judgment against Ali Mackie, Appellees filed in the United States District Court for the Northern District of Texas an "Application for an Order Setting Hearing Regarding Turnover Relief Against Ali Mackie and Freetown Mini Mart, Inc.," ("Turnover Application") pursuant to TEX. CIV. PRAC. & REM. CODE § 31.002 ("the Texas Turnover Statute" or "the turnover statute"), on November 2, 2004.  Specifically, they argued in the Turnover Application that Freetown should be held liable for the Final Judgment against Ali Mackie because Freetown was the alter ego of Ali Mackie.[4]  On November 4, 2004, Appellees personally served Ali Mackie and Najat Mackie in Michigan with subpoenas duces tecum ordering them to appear and produce documents in a turnover relief hearing in the Northern District of Texas involving the Final Judgment against Ali.

---

[4]  It is undisputed that the district court had jurisdiction over judgment debtor Ali Mackie arising from his counterfeiting activities in Dallas; it therefore had the authority to order turnover relief against him.  Because Freetown was neither a defendant nor a judgment debtor in the original contempt action, however, Appellees attempted to reach its assets to satisfy the Final Judgment against Ali Mackie by obtaining an order disregarding Freetown's corporate fiction.

Although Najat Mackie and Freetown ("Appellants") did not appear at the hearing on November 10, they were represented by counsel, who made an oral motion to dismiss Appellees' Turnover Application, which the court denied. Appellants' counsel also requested that the court adjourn to allow Appellants time to appear personally before the court. The court granted the motion and adjourned until November 18.

Appellants also failed to appear on November 18, but they were again represented by counsel who filed written motions to quash the subpoenas that had been served on Najat Mackie and Ali Mackie and a motion to dismiss the Turnover Application for lack of personal jurisdiction. After oral argument, the district court denied Appellants' motions, stating, "When the Mackies have shown up for a hearing, they have lied on each occasion, and I have found them in contempt of court for that. I do have jurisdiction over them, and I will enter the orders that Plaintiffs request." Although Appellees' Turnover Application requested the turnover only of Freetown's assets, the district court sua sponte ordered Najat Mackie's assets turned over as well. To reach this outcome, the district court first had to reverse pierce Freetown's corporate veil after finding that Freetown was Ali Mackie's alter ego, and then pierce Freetown's veil again after finding that Freetown was also Najat Mackie's alter ego.

The district court did so by entering three orders, dated

November 18, 2004. First, the court entered an order (1) denying Appellants' motion to dismiss for lack of personal jurisdiction and (2) denying the motions to quash the subpoenas served on Ali Mackie and Najat Mackie ("Order Denying Motion to Dismiss and Motion to Quash"). Second, it entered an order (1) piercing Freetown's corporate veil, finding that Freetown was the alter ego of Ali Mackie and holding Freetown and Najat Mackie liable for the $11 million Final Judgment against Ali Mackie, (2) "adding" both Najat Mackie and Freetown to the contempt order and to the Final Judgment, (3) awarding Appellees costs and attorney's fees, and (4) ordering Appellants' and Ali Mackie's assets frozen and turned over pursuant to the Texas Turnover Statute ("Turnover Order"). Third, the court entered an order appointing a receiver for Ali Mackie and for Appellants ("Order Appointing Receiver").

Appellants timely appealed all three of the district court's orders, asserting that (1) they did not have minimum contacts with Texas such that personal jurisdiction was proper in the district court; (2) the Texas Turnover Statute is an inappropriate vehicle through which to adjudicate the substantive rights of non-debtor third parties; (3) the district court's piercing of the corporate veil and finding of alter ego was erroneous; and (4) the district court erred when it denied their motion to quash the subpoena served on Najat Mackie.

## II.  DISCUSSION

### A.  Standard of Review

We review a district court's turnover judgment for abuse of discretion.  Beaumont Bank v. Buller, 806 S.W.2d 223, 226 (Tex. 1991).  A court abuses its discretion when it acts "in an unreasonable or arbitrary manner . . . without reference to any guiding rules and principles."  Id. (internal quotations and citation omitted).  In making this determination, we review errors of law de novo.  O'Sullivan v. Countrywide Home Loans, Inc., 319 F.3d 732, 737 (5th Cir. 2003).

We review a district court's decision to pierce the corporate veil for clear error.  Patin v. Thoroughbred Power Boats, Inc., 294 F.3d 640, 647 (5th Cir. 2002); Zahra Spiritual Trust v. United States, 910 F.2d 240, 242 (5th Cir. 1990).

### B.  Analysis

In entering the three orders at issue in this case, the district court erred to the extent that those orders apply to Appellants because (1) a court may not use a proceeding under the Texas Turnover Statute as a vehicle to adjudicate the substantive rights of non-judgment third parties; and (2) Appellees did not make the required showing under Texas law to establish that Freetown was Ali Mackie's alter ego.[5]

---

[5]  Additionally, we note that even if the district court had made a procedurally and substantively proper finding that Freetown was Ali Mackie's alter ego, Appellants were never served

-7-

1. **The Use of the Texas Turnover Statute to Pierce the Corporate Veil**

The Texas Turnover Statute is a procedural mechanism that

---

with a summons as required by FED. R. CIV. P. 4 to hale a defendant into federal court. Instead, Appellants were served only with a subpoena duces tecum commanding them to appear and produce documents at the turnover proceeding. The district court's adjudication of Appellants' substantive rights without valid service of process was improper. See FED. R. CIV. P. 4; Attwell v. LaSalle Nat. Bank, 607 F.2d 1157, 1159 (5th Cir. 1979) ("It is axiomatic that in order for there to be in personam jurisdiction there must be valid service of process."); see also Adams v. AlliedSignal Gen. Aviation Avionics, 74 F.3d 882, 885 (8th Cir. 1996) (holding that, where a defendant is served improperly, "the district court lack[s] jurisdiction over that defendant whether or not [the defendant] had actual notice of the lawsuit"); David D. Siegel, Supplementary Practice Commentaries, 28 U.S.C.A., Rule 4, Federal Rules of Civil Procedure, at C-4 (West 2006) ("A summons is process because its service subjects the person served to the court's jurisdiction, which is necessary to validate a judgment that the court might render against that person. A subpoena is also process, again in the sense of obtaining jurisdiction over the person served with it, but the subpoena acts only to exact testimony or obtain some document or other physical object from that person.").

However, this fact came to light for the first time at oral argument. Neither party briefed this precise issue, and Appellants did not assign it as error on appeal; therefore, we will not dispose of this case on this ground alone. See Ins. Corp. of Ireland, Ltd. v. Compagnie de Bauxites de Guinee, 456 U.S. 694, 702-04 (1982) (noting that, unlike subject-matter jurisdiction, which the court must consider sua sponte, "[b]ecause the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived. In McDonald v. Mabee, [243 U.S. 90 (1917),] the Court indicated that regardless of the power of the State to serve process, an individual may submit to the jurisdiction of the court by appearance"); see also United States v. Fagan, 821 F.2d 1002, 1015 n.9 (5th Cir. 1987) ("We do not search the record for unassigned error, and contentions not raised on appeal are deemed waived.").

gives Texas courts the power to satisfy a judgment by reaching the assets of a judgment debtor that cannot be attached or levied by ordinary legal process.[6]  In re Hamel, 180 S.W.3d 226, 228-29 (Tex. App.--San Antonio 2005).  Texas courts construing the turnover statute have expressly and consistently held that it may be used to reach only the assets of parties to the judgment, not

---

[6]  The Texas Turnover Statute, in relevant part, provides:

§ 31.002. Collection of Judgment Through Court Proceeding

(a) A judgment creditor is entitled to aid from a court of appropriate jurisdiction through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that:

    (1) cannot readily be attached or levied on by ordinary legal process; and

    (2) is not exempt from attachment, execution, or seizure for the satisfaction of liabilities.

(b) The court may:

    (1) order the judgment debtor to turn over nonexempt property that is in the debtor's possession or is subject to the debtor's control, together with all documents or records related to the property, to a designated sheriff or constable for execution;

    (2) otherwise apply the property to the satisfaction of the judgment; or

    (3) appoint a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment.

TEX. CIV. PRAC. & REM. CODE § 31.002.

-9-

the assets of non-judgment third parties.  See, e.g., Beaumont Bank, 806 S.W.2d at 227; Bay City Plastics, Inc. v. McEntire, 106 S.W.3d 321, 324 (Tex. App.--Houston 2003); United Bank Metro v. Plains Overseas Grp., 670 S.W.2d 281, 283 (Tex. App.--Houston 1983).  Moreover, the turnover statute is a purely procedural mechanism, and it is black-letter Texas law that proceedings pursuant to the turnover statute may not be used to determine the substantive property rights of the judgment debtors or of third parties.  Maiz v. Virani, 311 F.3d 334, 343-45 (5th Cir. 2002) (holding that a district court may not use a turnover proceeding to adjudicate whether a corporation is an individual judgment debtor's alter ego); Resolution Trust Corp. v. Smith, 53 F.3d 72, 80 (5th Cir. 1995) ("A proceeding to determine whether a transaction is fraudulent or otherwise to determine property rights of the parties is improper under the turnover statute, for the statute does not allow for a determination of the substantive rights of involved parties. . . . It is even more clear that a party not even before the court cannot have its rights determined via the turnover proceeding.") (internal quotations and citation omitted); Cross, Kieschnick & Co. v. Johnston, 892 S.W.2d 435, 438 (Tex. App.--San Antonio 1994) ("The turnover statute is purely procedural in nature; the statute does not provide for the determination of the substantive rights of the parties."); Steenland v. Tex. Commerce Bank Nat'l Ass'n, 648 S.W.2d 387, 389 (Tex. App.--Tyler 1983) (reversing the trial court's use of the

-10-

turnover statute to make factual findings without a jury trial on whether there was nonexempt excess value in judgment debtor's homestead).[7]  Even more specifically, Texas courts have held that a turnover proceeding is not an appropriate vehicle through which to make an alter ego determination and that a separate trial on the merits of that issue is required before the alter ego can be subject to a turnover proceeding.  Maiz, 311 F.3d at 336 (holding that the Texas Turnover Statute "cannot be utilized to adjudicate the substantive property rights of the two non-judgment debtor corporations in this case without a prior judicial determination which pierces their corporate veils"); United Bank Metro, 670 S.W.2d at 283 (noting that the turnover statute is not designed to "permit the [turnover applicant] to skip the trial on the merits in this case with respect to the alter ego issue and declare itself the winner").

_____

[7]  Appellees counter that language in some cases indicates that Texas courts have begun to read the turnover statute as authorizing courts to determine the substantive property rights of third parties as an aid to enforcing judgments under the statute.  See, e.g., Schultz v. Fifth Judicial Dist. Court of Appeals at Dallas, 810 S.W.2d 738, 740 (Tex. 1991), abrogated by In re Sheshtawy, 154 S.W.3d 114 (Tex. 2004) (stating that the turnover statute "authorizes the trial court to order affirmative action by the judgment debtor and others to assist the judgment creditor in subjecting such non-exempt property to satisfaction of the underlying judgment") (emphasis added).  Although this language might reflect "uncertainty as to how aggressive trial courts can be in enforcing turnover orders which affect the rights of non-judgment debtors," Maiz, 311 F.3d at 343 (referring to Schultz), it does not undermine the above cases that have expressly held that the turnover statute is not a vehicle to adjudicate substantive property rights.  See id.

-11-

Moreover, these limitations on the reach of the turnover statute--that it applies only to judgment debtors and that it may not be used to adjudicate substantive rights--ultimately spring from due process concerns consistent with those that underlie the requirement of personal jurisdiction; i.e., they prevent "the original trial court [from] reach[ing] out and assum[ing] jurisdiction for trial purposes of potential lawsuits involving third parties." Republic Ins. Co. v. Millard, 825 S.W.2d 780, 783-84 (Tex. App.--Houston 1992). Courts must respect such limitations on the turnover statute's reach because

> [w]hether a turnover order is enforceable by a contempt order directed to a stranger to the lawsuit is a serious matter that goes to the very heart of due process. A turnover order typically issues without service of citation. . . . [and] effectively shifts the burden to the judgment debtor to account for assets to satisfy a judgment. . . . A turnover order that issues against a non-party for property not subject to the control of the judgment debtor completely bypasses our system of affording due process. Otherwise, a court could simply order anyone (a bank, an insurance company, or the like) alleged to owe money to a judgment debtor to hand over cash on threat of imprisonment.

Ex parte Swate, 922 S.W.2d 122, 125 (Tex. 1996) (Gonzalez, J., concurring). Therefore, consistent with due process, a court may not--as the district court attempted to do in this case--use the turnover statute to adjudicate the rights and seize the assets of a third party who might not otherwise be amenable to jurisdiction in that court.[8] Republic Ins., 825 S.W.2d at 783-84.

---

[8] Appellants objected to lack of personal jurisdiction in the district court, arguing that they lacked sufficient minimum

-12-

The district court thus erred as a matter of law by using the turnover proceeding to find that Freetown was Ali Mackie's alter ego and entering the order reverse piercing Freetown's corporate veil.  See Maiz, 311 F.3d at 343-45; United Bank Metro, 670 S.W.2d at 281.  Texas law is clear that Appellees must pursue their alter ego proceedings in a separate trial on the merits in the appropriate forum before using the turnover statute to reach Appellants' assets to satisfy the judgment against Ali Mackie. Maiz, 311 F.3d at 343-45; United Bank Metro, 670 S.W.2d at 281.

## 2.    The Alter Ego Determination

contacts with the forum state such that haling them into a Texas court did not comport with "traditional notions of fair play and substantial justice."  Int'l Shoe v. Washington, 326 U.S. 310, 316 (1945).  The district court overruled this objection, stating only, "I do have jurisdiction over them, and I will enter the orders that Plaintiffs request."

Although Appellants extensively briefed this aspect of the personal jurisdiction issue before this court, and their objection below preserved the issue for appeal, we need not get into the finer points of this debate because it is subsumed in our discussion of the district court's improper use of the turnover statute.  Appellees do not argue that Appellants themselves had sufficient minimum contacts to be amenable to personal jurisdiction in a Texas court; instead, they argue that, because the district court had personal jurisdiction over Ali Mackie, it had personal jurisdiction over Appellants via the alter ego theory.  See Patin, 294 F.3d at 653 (noting that "federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court").  As discussed above, a turnover proceeding cannot be used to establish personal jurisdiction over a party not already amenable to personal jurisdiction in that court, which is precisely what Appellees attempted to accomplish in their request for turnover relief.  See Republic Ins., 825 S.W.2d at 783-84.

-13-

Appellees alternatively contend that, during the two-day proceeding pursuant to their Turnover Application, the district court did hold a "separate trial" on the merits of the alter ego issue apart from the turnover proceeding. There is no evidence in the record that any part of this proceeding could be characterized as a "separate trial," and thus our analysis could probably end with our above determination that the district court improperly used the turnover proceeding to adjudicate Appellants' substantive rights. However, out of an abundance of caution, we will proceed to address this argument. Even if there had been a separate trial on the merits, Appellees' argument would still fail because the district court's finding of alter ego and its reverse piercing of Freetown's corporate veil based on that finding were clear error.

Under Texas law, "[a]lter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." Castleberry v. Branscum, 721 S.W.2d 270, 272 (Tex. 1986). This standard applies equally to reverse-piercing cases such as this one, where it is alleged that holding only the individual liable would result in injustice. See Zahra, 910 F.2d at 244 (recognizing that courts can reverse pierce a corporation's veil based on a finding of alter ego); Amer. Petroleum Exchange, Inc. v. Lord, 399 S.W.2d 213, 216-17 (Tex. App.--Ft. Worth 1966) (allowing creditors to reach

-14-

corporate assets to satisfy an individual debtor's liability where the debtor owned the majority of the stock and "treated the corporation as his alter ego").  To determine whether the alter ego doctrine applies, a court considers the following factors:

> the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.

Permian Petroleum Co. v. Petroleos Mexicanos, 934 F.2d 635, 643 (5th Cir. 1991); see also Castleberry, 721 S.W.2d at 272.

The great weight of Texas precedent indicates that, for the alter ego doctrine to apply against an individual under this test, the individual must own stock in the corporation.  Permian Petroleum, 934 F.2d at 643 ("Texas courts will not apply the alter ego doctrine to directly or reversely pierce the corporate veil unless one of the 'alter egos' owns stock in the other."); Zahra, 910 F.2d at 245 (holding that a finding of unity between the individual and the corporation "alone cannot establish an alter ego relationship under Texas law, because [Appellants] are not direct shareholders of [the corporation]"); Castleberry, 721 S.W.2d at 272 (stating that, to be considered a corporation's alter ego, an individual must have "ownership and control") (emphasis added); Lucas v. Texas Indus., Inc., 696 S.W.2d 372, 374 (Tex. 1984) (same); Patterson v. Wizowaty, 505 S.W.2d 425,

-15-

428 (Tex. App.--Houston 1974) (noting that there is "no Texas authority for the proposition that an individual can be held personally liable under the alter ego doctrine when he owns none of the outstanding stock of the corporation").

In the instant case, the district court made no findings that Ali Mackie owned stock in Freetown, and the record reflects that Appellees offered no evidence of such ownership. Rather, the record shows that, while Ali Mackie performed managerial duties and held a position on Freetown's board of directors, Najat Mackie was the sole shareholder of Freetown. Appellees do not even argue before this court that they provided affirmative evidence to the district court to show that Ali Mackie owned stock in Freetown; instead, they merely assert that "Ali Mackie's alleged lack of stock ownership was not proven by Appellants."[9] Appellees thus rely exclusively on Ali Mackie's managerial control of Freetown to support their case that Freetown is Ali Mackie's alter ego, which, standing alone, is insufficient under Texas law to support an alter ego finding.[10] Id.

---

[9] This assertion is obviously insufficient to support a finding of stock ownership because Appellees, not Appellants, had the burden of proof on each element of the alter ego issue. See Torregrossa v. Szelc, 603 S.W.2d 803, 804 (Tex. 1980); Goldstein v. Mortenson, 113 S.W.3d 769, 781 (Tex. App.--Austin 2003).

[10] Appellees maintain that Stewart & Stevenson Serv., Inc. v. Serv-Tech, Inc., 879 S.W.2d 89, 108-09 (Tex. App.--Houston 1994), provides support for their contention that stock ownership is not necessary because the court stated that alter ego can be proven through "financial interest, ownership, or control" of the corporation. Id. (emphasis added). However, Appellees' argument

In the alternative, Appellees argue that the court could have pierced the corporate veil via the "sham to perpetrate a fraud" theory. See Castleberry, 721 S.W.2d at 272-73. This theory applies "if recognizing the separate corporate existence would bring about an inequitable result." Id. Even if the district court had expressly made such a finding (which it did not), it still would not suffice to disregard the corporate fiction in this instance because the court had to reverse pierce the corporate veil to reach Freetown's corporate assets. "Although the . . . 'sham to perpetrate a fraud' [theory] . . . may provide [a basis] for disregarding the corporate fiction, a reverse piercing case requires the creditor to establish an alter ego relationship between the individual debtor and corporation in order to treat them as one and the same." Zahra, 910 F.2d at 244 (emphasis added) (citing Zisblatt v. Zisblatt, 693 S.W.2d 944, 955 (Tex. App.--Ft. Worth 1985); Dillingham v. Dillingham, 434

---

that the court's use of the disjunctive in Stewart suggests that alter ego may be shown through control absent ownership mischaracterizes that case's holding and is inconsistent with the Texas Supreme Court's alter ego jurisprudence. In Stewart, the court reversed a lower court's finding of alter ego where, despite significant evidence of control, the individual did not own stock in the corporation. Id. To be sure, Texas case law does not indicate that the stock ownership requirement for a finding of alter ego is a per se bright-line rule, but "no cases that we uncovered dispute[] that the Texas courts will not treat a corporation and an individual as one and the same unless the individual has some ownership interest in the corporation." Zahra, 910 F.2d at 246; see also Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 228 (Tex. 1990) (reiterating the Castleberry requirements of "ownership and control"); Castleberry, 721 S.W.2d at 272.

S.W.2d 459, 462 (Tex. App.--Ft. Worth 1968); Amer. Petroleum Exchange, 399 S.W.2d at 216-17).  We therefore also decline to uphold the district court's veil piercing based on this theory.

### III.  CONCLUSION

For the foregoing reasons, we VACATE the district court's Order Denying Motion to Dismiss and Motion to Quash; Turnover Order; and Order Appointing Receiver to the extent that they apply to Appellants.  The motion for judicial notice carried with the case is DENIED.