Affirmed and Opinion filed June 29, 2010

 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-08-00482-CV



 

RAUL NAVARRO, DORIS NAVARRO, VIRGINA B. ABNEY,
ALABAMA COUSHATTA TRIBE OF TEXAS (A FEDERALLY RECOGNIZED INDIAN TRIBE),
AMARILLO FINANCIAL FREEDOM I, LP, AMARILLO FINANCIAL FREEDOM, INC., AMERICO
ACOSTA, MARQUITA ADAMSON, JOHN H. and DOROTHY P. ALEXANDER, RAQUEL AVALOS, JOHN
G. ALVARADO, JAMES R. BAILEY, BILL J. and betty l. barker, billy barnes, harvey
a. and babara s. baycroft, charles l. and margaret d. bechtold, deborah a.
bench, john black, vanala boles, phyllis m. breedlove, richard l. and linda
briggs, david and deena brown, francis austin brown as trustee of the mobley
family trust, nathan eugene bruton, guy h. and robyn f. burkhart, a.e. gene, mary
cade, doris b. cain, joyce cain, vinous w. and dorothy cantrell, cathy gandy
capuano, robert m. castle, jr., darlene meader riggs f/k/a darlene m. cates,
thelda a chambliss, bobbye chamlee, patricia m. chandler, john p. chirafis,
jr., ennis and mattie cole, laverne connally, margaret cramer, lavilla craven,
ronald crow, lori cummings, william m. daniels, joyce dawson, kathleen deaver,
gary and donna dockall, sixta de gomez, magda de quiroga, frances r. and wanda
deLulio, don and cletha dickerson, peggy dockstader, iva doherty, bernette l.
and steven b. dong, isabell dorries, mary alice duckett, kenneth dugger,
herbert eastwood, harlan h. enyeart faldmo family limited partnership, eddie
farrell, oleta farrell, carolyn fife, anna flippin, kathryn fisher, florence
france, william m. francis, carl and stella freeman, aide o. garcia, betty j.
granger, ada ruth green, as executor of the estate of mabel ellis, susan green,
geraldine greer, gera, ltd, florence gibson a/k/a jo gibson, billy hahn, anita
harper, jim hanna, sylvia harlan, haskin family trust, t.w. harrison, raymond
hebert, melba r. held, kathleen and aquileo hernandez, robert herrin, josie
herrin, austin stanley, sue hickman, howard r. and ruby L. hill, jimmy l. and
wanda j. hill, bruce hopewell, charles horn, BRENDA HOWARD, WILLIAM and NITA
HRACH, R.L. HUGULEY, T.J. HULL, MARTHA IBANEZ, CLAUDE JINKS, DAVID JIRON, AS
REPRESENTATIVE OF THE ESTATE OF BAYARDO JIRON, ROBERT E. JOHNSON, RALPH and
ELSIE JOSEPH, CHARLES H. JONES, RODNEY AND PATRICIA A. KENG, NORMA KITTRELL,
LOUIS E. KRANTZ, III, S. A. KUSE, LINDA and DAN W. LAKENMACHER, PHILLIP W.
LAWSON, QUEEN ANNE LAWSON, SHIRLEY LEATHERWOOD, PHYLLIS LEE, LYNN LEMON, EL
NORA LOBSTEIN, HELEN B. LUCIO, MARK MAHULA, GERTRUDE S. MARSH, AGNES S. MARTIN,
ROBERT and JUNE MARTIN, W. H. MASON, LEON and LUZ AMELIA McCLELLAN, BURNETT McCLOUD,
THOMAS McCLUNG, JOYCE McCORMICK, JOHN J. McEWEN, JOE and LIILIE McGOWAN, JAMES
AND LELA MEADER, GLEN and MARILYN MICHAL, MIKE and TERRY MILLER, MAURICE J. and
DORINE MOELLER AS TRUSTEES OF THE MAURICE J. and DORINE MOELLER REVOCABLE
LIVING TRUST, MAURICE J. MOELLER, INDIVIDUALLY, ROBERT S. MONTGOMERY, JAMES A.
MORGAN, CHARLES E. and ANN E. MORISEY, ARNIS MORRIS, OLEAIN MORRIS, EARL MORSE,
TOMMIE MURILLO, ROBERT MURPHY, FOY C. NELSON, CORYDON O. NICHOLS, PAULETTE
EVERETTE NORMAN, DOYLE NORRIS, WALTER O. and MADELEINE NOVELLY, WILLIAM NUGENT,
GERALD PACE, KENNETH C. PARSONS, PAMELA SCHULTZ PARSONS, JOHN H. PERSEFIELD,
MARILYN PLOCH, MORRIS PALUMBO, CONNIE L. RECER, DANNY REED, SAMUEL AND NACY
REILE, RICHARD REYNOLDS, RONALD RICHARDSON, RENE and TODD RIEDLINGER, VICTOR
RIOS, CURTIS ROBERTS, CHARLES RODGERS, TERRY ROZELL, C. A. SALAZAR, GENTIL
SALAZAR, VERLINE SCHULTE, GEORGE SCHULTZ, VIVIAN SCOTT, FERMIN SCROGGINS AS
TRUSTEE OF THE SCROGGINS FAMILY REVOCABLE LIVING TRUST, ALAN B. SHERMAN,
ALBERTA SINGER, CRISPIN AND MATTHEW SMITH, EUGENE SMITH, ROBERT M. SPRAGUE,
GERTRUDE STANSELL, MARGARET A. STERLING, NORMA J. STEWART, STOW FAMILY TRUST,
JOHN S. and WALTRAUD E. SWAIM, ZELMA THORN, LONNIE L. TODD, DIANA A. TREVINO,
CHARLES RAY and KAREN TURLEY AS TRUSTEES OF THE TURLEY REVOCABLE LIVING TRUST,
CHESSA VINES, EDNA VOELKER, KATHY S. and JIMMY L. VOWELL, MICHAEL WIKMAN, J. C.
WILLIAMSON, TERRY WINCHESTER, JUDY WOODFIN, JOEL and LINDA WORLEY, AND MARY ELIZABETH YOUNG, Appellants

 

V.

Grant Thornton, LLP, Appellee

 



On Appeal from the 129th
District Court

Harris County, Texas

Trial Court Cause No. 2004-05249



 

OPINION

This is an appeal of a summary
judgment dismissing claims against an accounting firm for aiding and abetting
primary violations of the Texas Securities Act.  Our main task on appeal is to
determine if a fact issue exists as to whether the accounting firm rendered
substantial assistance in these primary violations.  Concluding that there is
no genuine issue of material fact as to substantial assistance and that the
accounting firm is entitled to judgment as a matter of law, we affirm the trial
court’s judgment.

I.  Factual and Procedural
Background[1]

            In 2005, Charles Edwards was convicted
in a federal court in Georgia of 83 counts of wire fraud, money laundering, and
conspiracy relating to his running of a Ponzi scheme that resulted in
significant losses to many investors.  Edwards was the sole shareholder of ETS
Payphones, Inc. (“ETS”).  ETS’s business model was based on a program for the
sale and lease-back of customer-owned, coin-operated telephones (“Payphones”). 
ETS used distributors to sell Payphones to individuals.  After locating a person
interested in buying a Payphone, a distributor would sell the Payphone to the
buyer for a price of between $6,000 and $7,000, immediately after the
distributor bought the Payphone from ETS for a lower price.  The buyer would
then lease the Payphone back to ETS, with ETS agreeing to make monthly lease
payments to the buyer for 60 months.  ETS would agree to buy the Payphone back
from the buyer for the original purchase price within 180 days of the buyer
requesting a buyback.  At the end of the 60 month lease, the buyer had several
options, one of which was selling the Payphone back to ETS for the original
purchase price.  In general, the Payphones generated less money than the
monthly lease payments that ETS made to the lessors.  ETS made profits on the original
sales of the Payphones.  ETS used the profits from new sales to pay its
obligations to the existing lessors.  

Phoenix Telecom, Inc. (“Phoenix”)
employed a substantially similar business model.  Though Edwards did not own
Phoenix or work for Phoenix, Edwards advised Phoenix on how to enter the
Payphone business, and Phoenix had an oral agreement with Edwards to pay him
$100 for each Payphone Phoenix sold.  In July 2000, Phoenix was no longer able
to make its monthly lease payments, and Phoenix attempted to transfer its
operations to ETS.  Phoenix informed its lessors of an offer for them to
terminate their leases with Phoenix and sign new five-year leases with ETS.  In
August 2000, a receiver was appointed for Phoenix, and Phoenix’s assets were
frozen.  That same month, the Securities and Exchange Commission (“SEC”) filed
a civil enforcement action against Phoenix and others, and in September 2000,
ETS filed for bankruptcy protection.

Appellants/plaintiffs are
approximately 224 Texas residents who participated in the
purchase-and-leaseback program of either ETS or Phoenix (“Lessors”).
Appellee/defendant Grant Thornton, LLP (“Grant Thornton”) is an accounting firm
retained by ETS and Phoenix to perform services.  The Lessors sued Grant
Thornton asserting various tort claims, including the following: (1) claims
under the Texas Securities Act (“Securities Act”) for aiding and abetting ETS
or Phoenix in violating article 581-33(A)(1) of the Securities Act through the
sale of unregistered securities, (2) claims under the Securities Act for aiding
and abetting ETS or Phoenix in violating article 581-33(A)(2) of the Securities
Act through the sale of securities by means of untruths or omissions, (3)
conspiracy to commit common law fraud, and (4) various claims by 39 specific
Lessors (hereinafter the “39 Lessors”).  See Tex. Rev. Civ. Stat.  Ann. art.  581-33 (Vernon Supp. 2010). 


            Grant Thornton filed
several summary-judgment motions, asserting a variety of traditional and
no-evidence grounds.  The trial court signed a series of
partial-summary-judgment orders that eventually yielded a final judgment in
which the trial court disposed of all of the Lessors’ claims by summary
judgment.  

II.  Issues Presented

            On appeal, the Lessors
assert these three issues:

(1) 
Did the trial court err in
granting summary judgment because there was a fact issue as to whether Grant
Thornton aided and abetted ETS and Phoenix in their primary violations of the
Securities Act?[2]

 

(2) 
Did the trial court err by
granting summary judgment as to the Lessors’ conspiracy-to-defraud claims based
upon the two-year statute of limitations because the four-year statute of
limitations applies to these claims?

 

(3)  Did the trial court err in granting summary judgment as
to the claims of the 39 Lessors?

 

III.  Standard of Review

            In reviewing a no-evidence summary judgment, we
ascertain whether the nonmovant pointed out summary-judgment evidence raising a
genuine issue of fact as to the essential elements attacked in the no-evidence
motion.  Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 206–08
(Tex. 2002). In our de novo review of a trial court’s summary judgment, we
consider all the evidence in the light most favorable to the nonmovant,
crediting evidence favorable to the nonmovant if reasonable jurors could, and
disregarding contrary evidence unless reasonable jurors could not.  Mack
Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex. 2006).  The evidence
raises a genuine issue of fact if reasonable and fair-minded jurors could
differ in their conclusions in light of all of the summary-judgment evidence.  Goodyear
Tire & Rubber Co. v. Mayes, 236 S.W.3d 754, 755 (Tex. 2007).  We must
affirm the summary judgment if any of the independent summary-judgment grounds
is meritorious.  FM Props. Operating Co. v. City of Austin, 22 S.W.3d
868, 872 (Tex. 2000).  

IV.  Analysis

A.        Does the two-year statute of limitations apply to the
Lessors’ conspiracy-to-defraud claims?

 

            The trial court dismissed
the Lessors’ conspiracy-to-defraud claims after impliedly determining that the
two-year statute of limitations barred these claims as a matter of law.  In
their second issue, the Lessors assert that the trial court erred in dismissing
these claims because they are governed by the four-year statute of limitations
rather than the two-year statute.  The Lessors assert that conspiracy claims
are governed by the statute of limitations that pertains to the underlying
tort.  Because their conspiracy-to-defraud claims are based on common-law
fraud, which is governed by the four-year statute of limitations in section
16.004 of the Texas Civil Practice and Remedies Code, the Lessors argue that
their conspiracy-to-defraud claims are governed by this four-year statute of
limitations, rather than the two-year statute of limitations in section 16.003
of the Civil Practice and Remedies Code.  See Tex. Civ. Prac. & Rem. Code Ann. §§ 16.003, 16.004
(Vernon Supp. 2009, Vernon 2002).  The Lessors cite no Texas case holding that
section 16.004 applies to conspiracy-to-defraud claims.  Research has revealed
no Supreme Court of Texas case addressing which limitations period should be
applied to conspiracy claims.  However, in Mayes v. Stewart, this court
determined that section 16.003 applies to conspiracy-to-defraud claims.  See
11 S.W.3d 440, 453 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).  The Mayes
precedent is not contrary to any holding of the Supreme Court of Texas or of
this court sitting en banc and there has been no intervening, material change
in the statutory law since Mayes.  Therefore, we are bound by the Mayes
precedent to hold that the trial court correctly determined that section 16.003
applies to the Lessors’ conspiracy-to-defraud claims. See Chase Home Fin.,
L.L.C. v. Cal W. Reconveyance Corp., 309 S.W.3d 619, 630 (Tex. App.—Houston
[14th Dist.] 2010, no pet.); Mayes, 11 S.W.3d at 453.  Accordingly, we
overrule the Lessors’ second issue.

B.        Did the trial court err in granting summary
judgment dismissing the claims of the 39 Lessors?

 

            The trial court granted
summary judgment as to the claims of the 39 Lessors without specifying the
grounds upon which it relied.  Therefore, on appeal, the 39 Lessors must show
that each independent summary-judgment ground asserted against their claims does
not provide a basis for affirming the trial court’s summary judgment.  See
Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C., 207 S.W.3d 801, 826
(Tex. App.—Houston [14th Dist.] 2006, pet. denied).  On appeal, the 39 Lessors
have attacked the two summary-judgment grounds contained in Grant Thornton’s
April 5, 2005 motion for summary judgment.  However, the 39 Lessors have not
attacked the grounds asserted against their claims in Grant Thornton’s June 7,
2005 motion for summary judgment, which also served as a basis for the trial
court’s summary-judgment order of May 16, 2006.[3] 
Because the 39 Lessors have not challenged all of the independent
summary-judgment grounds upon which the trial court granted summary judgment,
we overrule the third issue and affirm the trial court’s judgment as to the
claims of the 39 Lessors.  See Bartee v. Baylor Coll. of Med., No.
14-06-00324-CV, 2007 WL 2989614, at *5 (Tex. App.—Houston [14th Dist.] Oct. 16,
2007, no pet.) (mem. op.).    

C.        Did the trial court err in granting summary
judgment as to the aiding and abetting claims under the Securities Act?

 

            The Securities Act
establishes both primary and secondary liability for securities violations. 
Primary liability arises in various circumstances, including when a person offers
or sells an unregistered security in violation of the Securities Act and when a
person offers or sells a security “by means of an untrue statement of a
material fact or an omission to state a material fact necessary in order to
make the statements made, in the light of the circumstances under which they
are made, not misleading.”  Tex. Rev.
Civ. Stat. Ann. art.  581-33A (Vernon Supp. 2010).  Secondary liability
is derivative liability for another person’s securities violation; it attaches
to an aider, defined as one “who directly or indirectly with intent to deceive
or defraud or with reckless disregard for the truth or the law materially aids
a seller, buyer, or issuer of a security.”  Id. art.  581-33F(2). 
Aiders are jointly and severally liable with the primary violator “to the same
extent as if [they] were” the primary violator.  Id.  

In their first issue, the Lessors
assert that genuine fact issues preclude summary judgment as to (1) claims
under the Securities Act for aiding and abetting ETS or Phoenix in violating
article 581-33(A)(1) of the Securities Act through the sale of unregistered
securities and (2) claims under the Securities Act for aiding and abetting ETS
or Phoenix in violating article 581-33(A)(2) of the Securities Act through the
sale of securities by means of untruths or omissions (hereinafter collectively
“Aiding and Abetting Claims”).[4]

            To prevail on these
claims, the Lessors must establish the following elements: (1) a primary
violation of the Securities Act (a violation of either article 581-33(A)(1) or
article 581-33(A)(2)); (2) Grant Thornton had general awareness of its role in
this violation; (3) Grant Thornton rendered substantial assistance in this
violation;  and (4) Grant Thornton either (a) intended to deceive the Lessors
or (b) acted with reckless disregard for the truth or the law.[5] 
Frank v. Bear, Stearns & Co., 11 S.W.3d 380, 384 (Tex. App.—Houston
[14 Dist.] 2000, pet. denied).  

Analysis of Grant Thornton’s Alleged Failure to Disclose
Matters to Regulators and to the Lessors

 

            As a threshold matter, we
note that, in addition to relying upon evidence of various actions by Grant
Thornton, the Lessors also assert that there was a genuine fact issue regarding
substantial assistance based on Grant Thornton’s failure to disclose the
following matters to government regulators or to the Lessors:

·       
The Payphone sale/leaseback
business model was a Ponzi scheme.

·       
The ETS/Phoenix businesses were Ponzi
schemes.

·       
A relationship existed between
Edwards, ETS, and Phoenix.

·       
Edwards was making money on each
Payphone sale made by Phoenix.

·       
The Pennsylvania Securities
Commission (“Pennsylvania Commission”) was investigating both ETS and Phoenix.

·       
Phoenix and ETS were not
competitors.

·       
Edwards was siphoning ETS investor
funds into other corporations.

 

            In their opening brief,[6]
the Lessors make various references to Grant Thornton’s failure to disclose
these matters; however, the Lessors never assert that Grant Thornton had a duty
to disclose these matters.[7] 
The Lessors assert that, if an alleged aider commits acts that further the
primary violation of the Securities Act, then failures to disclose information
can be considered in determining if the alleged aider rendered substantial
assistance in the primary violation, regardless of whether the alleged aider
had a duty to disclose.[8] 
The Lessors cite no cases addressing this issue under the Securities Act, and
research has not revealed any.  We conclude that, if an alleged aider under the
Securities Act has no duty to disclose, then the alleged aider’s failure to
disclose cannot be considered in determining whether the alleged aider rendered
substantial assistance in the primary violation of the Securities Act.[9]
See Eurycleia Partners, LP v. Seward & Kissel, LLP, 910 N.E.2d 976,
981 (N.Y. 2009) (holding, under New York law, that investors’ claims against
hedge fund’s lawyers for aiding and abetting fraud could not be based on lawyers’
failure to disclose because lawyers had no duty to disclose); Stanfield
Offshore Leveraged Assets, Ltd v. Metro. Life Ins. Co., 883 N.Y.S.2d 486,
489–90 (N.Y. App. Div. 2009)  (holding, under New York law, that claims against
lead arrangers of  company’s refinancing for aiding and abetting fraud could
not be based on arrangers’ failure to disclose that the company was insolvent
unless the arrangers had a duty to disclose this information to the
plaintiffs).  Because the Lessors have not asserted or briefed an argument that
Grant Thornton had a duty to disclose the items listed above to the regulators
or to the Lessors, we do not consider Grant Thornton’s alleged failure to
disclose those matters to the regulators or to the Lessors in determining whether
there is a fact issue as to substantial assistance.

            As to the Lessors other than the 39 Lessors, the
trial court granted summary judgment as to all of their Aiding and Abetting
Claims based on the ground that there was no evidence that Grant Thornton
rendered substantial assistance in the primary violations of the Securities Act
by ETS or Phoenix.  The Lessors challenge this ruling on appeal and point to
evidence of the following matters as raising a genuine fact issue regarding substantial
assistance:

●         Grant Thornton’s Dallas office audited
Phoenix’s financial statements as of September 30, 1998, and December 31, 1998
but did not include a “going concern” paragraph in its audit reports expressing
substantial doubt about Phoenix’s ability to continue as a going concern for a
reasonable period of time not to exceed one year beyond the date of the
financial statement being audited (hereinafter “Going Concern Paragraph”). The
Payphone leases were accounted for as capital leases, and the financial
statements showed that Phoenix had a negative net worth of more than $4.7
million as of December 31, 1998, and an operating loss of more than $1 million
during the period ending on December 31, 1998. The Lessors cite Grant Thornton
work papers stating (1) that because the lessors have a “put option,” all of
Phoenix’s lease obligations have been classified as current liabilities; (2) as
disclosed in the notes to the financial statement, Phoenix is unable to pay
this liability with its present resources; (3) to date, there have not been a
significant number of “puts” exercised by lessors, and Grant Thornton had no
indication that this situation would change in the next year; (4) Phoenix
believed that it would be able to raise funds to pay the “puts” by reselling
the Payphones; (5) this was consistent with Grant Thornton’s observation that
Phoenix has more difficulty in finding Payphones to buy than it had in finding
buyers for Payphones; (6) this was also consistent with the dynamics of the
Payphone industry cited in a report on this industry by Hoak, Breedlove, Wesneski
& Company; and (7) Grant Thornton concluded that there was not substantial
doubt regarding the continued existence of Phoenix.

 

●         The Lessors’ accounting expert, D.
Paul Regan, testified that “there was substantial doubt as to Phoenix’s ability
to realize its assets or liquidate its liabilities in the ordinary course of
its operations.” In Regan’s opinion, Grant Thornton should have included a
Going Concern Paragraph in its report on Phoenix’s audited financial statements
as of September 30, 1998, and December 31, 1998 because: (1) There were
significant “impairments of assets” which required Phoenix to have impairment
reserves, yet Phoenix included these assets in its balance sheet with no
impairment reserve; (2) Phoenix’s ability to “realize its assets” and liquidate
its liabilities in the ordinary course of its operations was in substantial
doubt; (3) Phoenix’s current assets totaled $5.2 million, while its current
liabilities totaled $19.1 million; (4) Phoenix’s “Member’s Equity” was reported
at a deficit of $4.8 million, even before the reduction for required impairment
reserves; and (5) Grant Thornton noted that Phoenix did not have the resources
to satisfy its obligations under capital leases totaling $18.7 million.   

 

●         Grant Thornton’s Atlanta office
compiled financial statements for ETS as of March 31, 1999, in accordance with
Generally Accepted Accounting Principles (“GAAP”), and these statements treated
the leases as capital leases (“ETS  GAAP Statements”).  In its report of these compiled financial statements,
Grant Thornton stated that “a compilation is limited to presenting in the form
of financial statements information that is the representation of management.
[Grant Thornton has] not audited or reviewed the accompanying financial
statements and, accordingly, [Grant Thornton does] not express an opinion or
any other form of assurance on them.” 

 

●         Grant Thornton’s Atlanta office also
compiled financial statements for ETS as of March 31, 1999, that were not in
accordance with GAAP, and these statements treated the leases as operating
leases (“ETS Non-GAAP Statements”).  In its compilation report for the ETS Non-GAAP
Statements, Grant Thornton stated on the first page that the financial
statements are not in accordance with GAAP and explained the departures from
GAAP in the ETS Non-GAAP Statements and how these items should be accounted for
under GAAP.  Grant Thornton also stated that “users of these financial
statements should recognize that they might reach different conclusions about
the Company’s financial position, results of operations, and cash flows if they
had access to revised financial statements prepared in conformity with [GAAP].”


 

●         Grant Thornton did not include a Going
Concern Paragraph in the notes to either of these financial statements.  The
ETS GAAP Statements showed that ETS had operating losses in excess of $32
million for the 15-month period ending on March 31, 1999, and that ETS had a
negative “accumulated deficit” on March 31, 1999 in excess of $24 million. The
ETS Non-GAAP Statements showed that ETS had operating income in excess of $3.5
million for the 15-month period ending on March 31, 1999, and that ETS had
retained earnings on March 31, 1999 in excess of $3.7 million. 

 

 

●         Both the ETS GAAP Statements and the
ETS Non-GAAP Statements were included in a rescission-offer letter that ETS
sent to Pennsylvania residents who had bought Payphones and leased them back to
ETS.  These letters offering rescission to Pennsylvania lessors were sent in
November 1999, under an agreement between
ETS and the Pennsylvania Commission.  The letters explained the differences
between the ETS GAAP Statements and the ETS Non-GAAP Statements. 

 

●         In the notes to the ETS GAAP
Statements, Grant Thornton stated that “The Company’s management believes that
the operating loss and accumulated deficit do not reflect an inability of the
Company to continue as a going concern.  Management believes that the
historically low rate of investors exercising their ‘put’ option indicates a
high degree of lessor satisfaction.  Management does not foresee any dramatic
change in the amount of put options that will be exercised in the future.”

 

●         Mario Commito, who was ETS’s Chief
Financial Officer when it retained Grant Thornton’s services, testified that
(1) Charles Edwards indicated to Commito that he wanted to have ETS’s
financials audited and asked Commito to find a new accounting firm to perform
the audit; (2) Commito contacted Andre Schnabl of Grant Thornton and “explained
to him that we were looking to have a certified audit”; (3) Edwards wanted a
certified audit done; and (4) Grant Thornton had to do a preliminary review to
define issues relating to the preparation of audited financials so that they
could present a quote to ETS as to how much an audit would cost.  Edwards
testified that ETS originally hired Grant Thornton because Schnabl “thought he
could get [ETS] an audited statement with operational leases.”  According to
Edwards, after Schnabl “ran it upstream, they would not allow him to do it.” 
In his billing entries, Schnabl described 6 hours of work that he performed for
ETS as “audit.”  Another Grant Thornton employee described 30 hours of work
performed for ETS as “audit.” 

 

●         In April 1999, Commito faxed Schnabl a
draft of a letter composed by Carl Schneider (a Pennsylvania lawyer working for
ETS) to the Pennsylvania Commission seeking to respond to the Pennsylvania Commission’s
concerns that ETS had been selling unregistered securities in Pennsylvania in
violation of Pennsylvania securities laws.  In the draft letter, ETS’s lawyer
states that ETS will prepare unaudited financial statements for the year ended
December 31, 1998, treating its leases as capital leases.  According to the
draft letter, though Grant Thornton will not be auditing these financial
statements, Grant Thornton will advise ETS and “will be prepared to advise [the
Pennsylvania Commission] (1) that the basis of presentation in these financial
statements conforms with GAAP, and (2) if [ETS] uses the same presentation in
its financial statements for its new fiscal year end of March 31, 1999, Grant
Thornton will be prepared to issue an audit opinion that the March 31, 1999,
financial statements conform with GAAP, without any qualification regarding the
basis of the presentation.”  Apparently referring to this part of the draft
letter, Commito told Schnabl, “I really appreciate your commitment to a clean
opinion on our 3/31/99 F/S.”  There is no evidence of any response from Schnabl
to Commito’s statement.  

 

●         In a memo sent to individuals at ETS
and Grant Thornton, Schneider stated that: (1) in August 1998, ETS and the
Pennsylvania Commission had an understanding that a rescission offer would be
sent to Pennsylvania lessors within thirty days; (2) fourteen months had passed
as of October 1999, and ETS had not yet made the offer; and (3) the
Pennsylvania Commission realizes that much of the delay was caused by the delay
in producing financial statements.

 

●         In a handwritten note in Grant
Thornton’s files, the unknown author of the note states, “Andre refers to
‘synthetic’ & ‘virtual synthetic’ leases.”  

 

●         On February 2, 2000, in an investigative
interview before the SEC regarding Phoenix, George Banks of Grant Thornton was
asked whether he agreed that Phoenix was in “a pretty tough financial
situation,” given that it had current assets of less than $5.3 million and
current liabilities of $19 million.  Banks replied, “Well, I would agree that
one could develop that conclusion, but quite frankly in my view it’s not nearly
as bad as it looks.  We . . . have a case of the financial statements
being—because of the oddities of [GAAP] you’re seeing a picture here that
probably is much worse than it is.”  Banks further explained that $18 million
of the liabilities were from five-year leases that were considered current
liabilities because of the ability of the lessors to exercise a put-option on
180 days’ notice.  However, Banks stated that based on all the evidence Grant
Thornton had, in Grant Thornton’s view, the likelihood of the current
liabilities having to be paid in the next year was remote.

 

●         On April 26, 2000, in a hearing before
the SEC regarding ETS, Andre Schnabl of Grant Thornton was asked whether ETS
had to keep selling Payphones to meet its obligations.  Schnabl responded, “I
am not sure that I can be that definitive because I am unclear as to the rate
of appreciation because the company has the option also to sell, just as they
have bought lots of payphones they can sell lots of payphones and then I am not
sure as to the market for that.  The secondary market for buying large
inventory of located revenue-generating phones is but, [sic] clearly, if the
rates [sic] of appreciation is lower than the cost of capital inevitably gross
becomes critical to survival.”  When asked if he was saying that ETS had to
keep selling more and more Payphones, Schnabl responded “That is based on the assumption
that gross is lower than the cost of capital and I do not know that.”

 

●         In February 1999, for the purposes of consideration and discussion
by ETS’s management, Grant Thornton proposed various possibilities for
restructuring ETS.  The stated purposes of the restructuring under
consideration were (1) to provide an operating structure for ETS that would
increase the likelihood of ETS becoming a public company, (2) to allow Edwards
to control the Payphones leased by ETS for the benefit of Edwards and his
family, and (3) to obtain estate tax savings for Edwards.  

 

●         An October 26, 1999 memo from Schneider
(ETS’s Pennsylvania lawyer) indicates that, in October 1999, ETS was
considering a proposal to restructure the company in a way that would
purportedly remove approximately $164 million in liabilities from ETS’s GAAP
balance sheet and that this restructuring could be given retroactive effect and
reflected on the financial statements to be included in the Pennsylvania
rescission offer.  The financials sent out with the Pennsylvania rescission
offer did not reflect such a restructuring, and there is no evidence that such
a restructuring ever occurred.

 

There is no summary-judgment evidence
that raises a genuine issue of fact regarding the following assertions by the
Lessors:

·       
Grant Thornton stalled the
Pennsylvania Commission’s investigation by not timely producing its work
product regarding the ETS financial statements.

 

·       
Grant Thornton attempted “to avoid
securities laws” by suggesting that the Payphone leases be re-named as
“synthetic & virtual synthetic leases.”  

 

·       
Grant Thornton “improperly put its
stamp of approval on the ETS/Phoenix Ponzi scheme” by issuing its compilation
reports for ETS or its reports on Phoenix’s audited financial statements.

 

·       
Grant Thornton partners George
Banks and Andre Schnabl gave SEC testimony defending ETS and Phoenix that
delayed a cease and desist order and allowed months of continued sales to new
investors (through July 2000 for Phoenix and through September 2000 for ETS).

 

·       
Grant Thornton aided corporate
restructuring to siphon money from ETS, alter the appearance of the financial
statement, and set up special purpose entities to help Edwards’s goal of owning
all the Payphones.

 

·       
If Grant Thornton began audit work
for ETS, then Grant Thornton had a duty to continue and complete the audit and
to ensure that ETS’s audited financial statements complied with accounting
standards.[10]

 

      In addition, there is no
evidence of any of the following:

●         that Grant Thornton had
any interaction with the Lessors or any involvement in the purchase-and-leaseback
transaction with the Lessors;

 

●         that the Lessors heard
about Grant Thornton from the individuals who solicited them and who sold them
the Payphones;

 

●         that the Lessors received
or reviewed the ETS GAAP Statements or the ETS Non-GAAP Statements compiled by
Grant Thornton;[11] 


 

●         that any of the Lessors
received or reviewed the Phoenix financial statements audited by Grant Thornton
in deciding to enter into the Payphone purchase-and-leaseback transaction with
Phoenix;

 

●         that ETS ever
restructured or reorganized based on the models or proposals suggested by Grant
Thornton; or

 

●         that Grant Thornton ever
advised the Pennsylvania Commission that it was prepared to issue an “audit
opinion” like that described in the April 1999 letter drafted by Schneider or that
Grant Thornton issued such an opinion.  

 

After carefully considering all the
summary-judgment evidence in the light most favorable to the Lessors, crediting
evidence favorable to the Lessors if reasonable jurors could and disregarding
contrary evidence unless reasonable jurors could not, we conclude that no
reasonable juror could find that Grant Thornton rendered substantial assistance
in the primary violations of the Securities Act by ETS or Phoenix.[12]
See generally Crescendo Invs., Inc. v. Brice, 61 S.W.3d 465, 472–73 Tex.
App.—San Antonio 2001, pet. denied) (holding as a matter of law that defendants
did not substantially assist in the primary violations of the Securities Act).[13] 
The Lessors also assert that Grant Thornton breached a duty to withdraw from
its representation of ETS and Phoenix after it allegedly discovered the fraud
by these companies.  We presume for the sake of argument that Grant Thornton had
such a duty to withdraw and breached this duty.  Even under this presumption,
Grant Thornton’s failure to withdraw resulted only in the completion by Grant
Thornton of the actions reflected in the evidence that we already have determined
do not constitute substantial assistance as a matter of law.  Therefore, any
alleged breach by Grant Thornton of a duty to withdraw does not alter the
conclusion of our analysis.

The Lessors rely on an opinion from
the Third Court of Appeals.  See Goldstein v. Mortenson, 113
S.W.3d 769, 777 (Tex. App.—Austin 2003, no pet.).  In that case, the trial court
rendered judgment against defendant Goldstein for more than $36 million in
actual damages based on findings that he was liable under each of the following
claims: (1) primary violations of the Securities Act, (2) aiding and abetting
primary violations of the Securities Act, (3) fraud, and (4) conspiracy to
defraud the plaintiff investors.  See id. at 774–75.  After adding more
than $15 million for usury violations, $200 million in punitive damages, and
prejudgment interest, the trial court rendered judgment against Goldstein for
an amount in excess of $264 million.  See id. at 775.  The court of
appeals concluded that the evidence was legally insufficient to support
recovery against Goldstein based on the usury violations, the primary
violations of the Securities Act, and the claim that Goldstein committed
fraud.  See id. at 776–82.  The court concluded that the evidence was
sufficient to support the finding that Goldstein conspired to defraud the
investors and that Goldstein’s vicarious liability for fraud satisfied the
predicate for punitive damages.  See id. at 779–82.  After reducing the
punitive damages award to $73.2 million based on the punitive damages cap, the
court of appeals affirmed a judgment of more than $121 million in favor of the
plaintiffs.  See id. at 783.

            Though not necessary to
the court of appeals’s judgment, the Goldstein court addressed the
aiding and abetting theory of recovery, concluding that the evidence was
sufficient to support the “general awareness” and “reckless disregard”
findings.  See id.  The Goldstein court briefly stated that there
was sufficient evidence of substantial assistance based on Goldstein’s
“arranging” of an $8.6 million loan for the primary violator.  See id.
The court concluded that this assistance was substantial because it “enabl[ed]
[the primary violator] to continue to operate, as well as to delay the
Securities Board’s discovery of wrongdoing.”  Id. at 777.  The Goldstein
court reached this conclusion even though it conceded that there was no
evidence that the loan was ever funded or that the primary violator received
any money as a result of the proposed loan.  See id. at 776–77 &
n.8.  The Supreme Court of Texas subsequently disapproved of the Goldstein court’s
analysis regarding “general awareness” and “reckless disregard,”
concluding that the Goldstein court’s low threshold for these elements
contradicted the requirements of the Securities Act.  See Sterling
Trust Co. v. Adderley, 168 S.W.3d 835, 841–43 (Tex. 2005).  We choose not
to follow the Goldstein court’s obiter dicta regarding substantial
assistance.[14]

The summary-judgment evidence does
not raise a genuine fact issue regarding the essential element of substantial
assistance, and Grant Thornton was entitled to judgment as a matter of law
based on its no-evidence ground challenging this element.[15] 
Therefore, the trial court did not err in granting summary judgment as to all
Aiding and Abetting Claims asserted by the Lessors other than the 39 Lessors.[16] 
Accordingly, we overrule the first issue.  

V.  Conclusion

Under binding precedent from this
court, the trial court correctly determined that the two-year statute of
limitations from section 16.003 of the Texas Civil Practice and Remedies Code applies
to the Lessors’ conspiracy-to-defraud claims.  The 39 Lessors have not shown
that the trial court erred in granting summary judgment as to their claims
because they have not challenged all of the independent summary-judgment
grounds upon which the trial court relied in dismissing their claims. The trial
court did not err in determining that the summary-judgment evidence did not
raise a genuine issue of material fact as to whether Grant Thornton rendered substantial
assistance in the primary violations of the Securities Act by ETS or Phoenix,
as alleged in support of the Aiding and Abetting Claims.  Nor did the trial
court err in granting summary judgment as to the Aiding and Abetting Claims. 
Accordingly, we affirm the trial court’s judgment.  

 

 

 

                                                                        /s/        Kem
Thompson Frost

                                                                                    Justice

 

Panel consists of Justices Yates,
Frost, and Brown.

 

 









[1]
The record is voluminous, and the factual and procedural history complex.  We
mention only the factual and procedural background relevant to the issues
presented in this appeal.





[2]
In their first issue, the Lessors assert that
the trial court erred in granting summary judgment because “legally and
factually sufficient evidence shows Grant Thornton aided and abetted primary
violations of the Texas Securities Act.”  However, in their argument, the
Lessors state the standard for reviewing a trial court’s summary judgment, and
the Lessors have assigned error regarding the trial court’s granting of summary
judgment as to their aiding and abetting claims under the Securities Act.  Liberally
construing their opening brief, the Lessors assert that there was a fact issue
precluding summary judgment as to the statutory aiding and abetting claims.

 





[3]
In this order, the trial court granted “the
motions for summary judgment of Defendant Grant Thornton . . . as
to the following: . . . All claims asserted by the 39 Plaintiffs identified in
Defendant’s Exhibit Y (with ETS leases).” (emphasis added).

 





[4]
Most of the remaining Lessors did not assert aiding and abetting claims
regarding the sale of unregistered securities when the trial court granted
summary judgment as to their claims; however, some of the remaining Lessors did
assert such claims.





[5]
The Supreme Court of Texas has affirmed the “general awareness” requirement,
holding that the Securities Act’s “reckless disregard for the truth or the law”
standard means that an alleged aider can be held liable only if it rendered
assistance “in the face of a perceived  risk” that its assistance would
facilitate untruthful or illegal activity by the primary violator.  See
Sterling Trust Co. v. Adderley, 168 S.W.3d 835, 842 (Tex. 2005).  In order
to perceive such a risk, the alleged aider must possess a “‘general awareness
that his role was part of an overall activity that is improper.’” See id.
(quoting Gould v. American-Hawaiian S.S. Co., 535 F.2d 761, 780 (3rd
Cir. 1976)).  





[6]
At one point in their reply brief, the Lessors assert
that Grant Thornton “had a duty to disclose or withdraw.” Even if this
statement were timely, it is not an assertion that Grant Thornton had a duty to
disclose because Grant Thornton could have satisfied this alleged duty by
withdrawing. We address the alleged duty to withdraw below.

 





[7]
The Lessors’ expert, D. Paul Regan, did not
testify that Grant Thornton had a duty to disclose the above-listed items to
regulators or to the Lessors.  The Lessors cite the testimony of Stephen
McEachern, Grant Thornton’s expert.  McEachern, however, testified that, if an
accounting firm detects material fraud while doing a compilation and if that
fraud has not been detected previously and accounted for, then the accounting
firm would have a duty to inform the client but no duty to inform anyone other
than the client.

 





[8]
The Lessors assert that the facts of the case at
hand are similar to those in Fund of Funds, Limited v. Arthur Andersen &
Company.  See 545 F. Supp. 1314 (S.D.N.Y. 1982).  The Fund of Funds
case involved “highly unusual circumstances,” in which mutual funds sued their
own accounting firm for aiding and abetting a violation of section 10(b) and rule 10b-5 of the Securities Exchange Act
by one of the accounting firm’s other clients.  See id. at 1354–59.  The
federal district court in Fund of Funds held that the accounting
firm owed a duty to the mutual-fund clients whose financial statements it was
auditing to determine whether the records fairly presented the funds’ financial
position and to disclose irregularities which the auditors happened upon.  See id. at 1357. 
There is no evidence that Grant Thornton audited any financial statements for
the Lessors.  The Fund of Funds case involved an unusual fact
pattern that is significantly different from the facts in the case under
review.

 





[9]
The Lessors cite cases articulating a doctrine
from federal securities law regarding aiding and abetting liability.  Under
this doctrine, if an alleged aider has a duty to disclose the primary
violation, recklessness is sufficient to establish scienter; however, even
absent a duty to disclose, an alleged aider’s failure to disclose can be
considered in the substantial-assistance analysis if this failure to disclose
was consciously intended to further the principal violation.  See, e.g., SEC
v. Tambone, 550 F.3d 106, 144 (1st Cir. 2008), withdrawn, 573 F.3d
54 (1st Cir. 2009) (en banc), reinstated in part, 597 F.3d 436, 450 (1st
Cir. 2010) (en banc).  However, we conclude that this doctrine contradicts the
unambiguous language of the Securities Act, under which “reckless disregard for
the truth or law” is sufficient scienter for all aider claims.  See Tex. Rev. Civ. Stat. Ann art.
581-33(F)(2); Sterling Trust Co. v. Adderley, 168 S.W.3d 835, 837 (Tex.
2005).

 

 





[10]
The Lessors make this assertion without providing any citation.  Regan, the
Lessors’ expert, did not testify that such a duty exists.  In another part of
their opening brief, the Lessors suggest that McEachern, Grant Thornton’s
expert, testified to such a duty. The Lessors cite an isolated statement from McEachern’s
deposition, in which he states, “[b]ut if you are asked to report on the
financial statements after you have done audit work, then I think the standards
say that you should report at the highest level that you’ve performed work at
[audit standards].”  Even ignoring all contrary testimony from this deposition,
McEachern did not testify to the existence of any duty; rather, he testified to
what he thought the standards say.  McEachern apparently was referring to
paragraph 5 of the Statements on Standards for Accounting and Review Services 1
(Section 100.05), which the record reveals states, “when the accountant
performs more than one service (for example, a compilation and an audit), he
should issue the report that is appropriate for the highest level of service
rendered.”  The record reflects that the staff of the American Institute of
Certified Public Accountants’s Accounting and Review Services Committee has
published an interpretation of this section, in which the staff states that
this section “imposes no requirement for the accountant to ‘upgrade’ his report
because he has performed other accounting services.”  In addition, sections
100.44 to 100.49 make it clear that simply beginning some audit work does not
trigger a duty to complete an audit and issue an audit report.   





[11]
ETS sent the rescission offers with the
compilation reports from Grant Thornton to the Pennsylvania lessors, not to the
Lessors, who are Texas residents. 

 





[12]
The Lessors assert that we should consider five
factors from a comment to section 876 of the Restatement (Second) of Torts in
determining whether a fact issue exists as to substantial assistance.  See
Restatement (Second) Torts § 876
cmt. d (1977). Research has revealed no Texas case that applies these factors
in analyzing substantial assistance in an aider claim under the Securities Act,
and the Supreme Court of Texas has stated that it is an “open question” whether
section 876 of the Restatement will be adopted in Texas.  See Juhl v.
Airington, 936 S.W.2d 640, 643 (Tex. 1996).  In any event, even if we were
to apply these factors in our analysis, our conclusion would not change. 
Therefore, we need not and do not address whether these factors apply.

 





[13]
In the Crescendo Investments case, a sister court of appeals concluded
that there was no substantial assistance as a matter of law. See Crescendo
Invs., Inc., 61 S.W.3d at 472–73.  Though some analogies can be made to the
facts of this case, the facts in Crescendo Investments were not the same
or substantially similar to those in this appeal.  Indeed, research has
revealed no case with the same or substantially similar facts in the context of
a determination as to whether there is a fact issue as to substantial assistance.





[14] 
The Lessors also cite Ponce v. SEC.  See 345 F.3d 722 (9th Cir.
2003).  The Ponce case did not involve a private action for damages;
instead, the Ponce court reviewed an SEC administrative order
sanctioning an accountant practicing before the SEC.  See id. at
740–41.  In Ponce, the primary violation was based on filing audited
financial statements with the SEC, which the accountant prepared and
certified.  See id. at 734–38.  The facts in Ponce are
substantially different from those in this appeal.





[15]
We do not address whether there is a fact issue as to Grant Thornton’s general
awareness of its alleged role in the Securities Act violations or whether Grant
Thornton (a) intended to deceive the Lessors or (b) acted with reckless
disregard for the truth or the law.  We have not discussed evidence relevant
only to Grant Thornton’s awareness, scienter, or state of mind, and not
relevant to whether Grant Thornton rendered substantial assistance in the
primary violations of the Securities Act by ETS or Phoenix.





[16]
The Lessors rely on First Federal Savings and Loan Association v. Oppenheim,
Appel, Dixon & Co. See 629 F. Supp. 427, 442–43 (S.D.N.Y.
1986).  In that case, the court held that the complaint stated a claim against
an accounting firm for aiding and abetting a federal securities violation based
on allegations that the firm knew of the primary violation and that the firm
sent to the investors audit-confirmation letters containing misrepresentations
regarding facts related to the primary violation.  See id.  This case is
not on point.